UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

VONELL LAVELL SHAW,

        Plaintiff,

        v.                                     Case No. 23-cv-1272-bhl

DYLAN HOFFSTATTER, et al.,

        Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

    Plaintiff Vonell Lavell Shaw, an inmate at the Green Bay Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Eighth Amendment claims based on allegations that Defendants Dylan Hoffstatter and Michael Cliver were deliberately indifferent to the risk of substantial harm that he posed to himself. On August 2, 2024, Defendants moved for summary judgment. For the reasons explained below, the Court will grant the motion and dismiss this case.

### BACKGROUND

    During the relevant time, Shaw was incarcerated at Columbia Correctional Institution and housed in the restrictive housing unit. Inmates in the restrictive housing unit typically present a high security risk, including a risk of injury to others and/or themselves. Hoffstatter worked as a lieutenant and was tasked with helping to supervise the entire institution. Cliver worked as an observation checker and was responsible for monitoring inmates on observation status every fifteen minutes. Dkt. Nos. 33, 56 at ¶¶1-6.

On August 6, 2022, at about 10:10 a.m., Hoffstatter was contacted by an officer who informed him that Shaw was in the dayroom without permission and was refusing to return to his cell. Hoffstatter spoke to Shaw and informed him he would be placed in temporary lockup for disobeying the order to return to his cell. According to Shaw, he informed Hoffstatter that he was suicidal and having psychological issues. Hoffstatter asserts that Shaw's comments were vague, but based on his past experiences with Shaw and Shaw's long history of self-harm when he does not get his way, he and another officer decided to place Shaw on observation status for his own well-being and safety. Clinical observation is a non-punitive status used for temporary confinement to ensure an inmate's safety. Dkt. Nos. 33, 56 at ¶¶7-16, 19-20.

Shortly thereafter, at about 10:20 a.m., Hoffstatter contacted Kristina Lowry, who was the on-call psychological services unit clinician. Ms. Lowry agreed that Shaw should be placed in observations status for further monitoring. Shaw asserts that he told Hoffstatter that he had a razor and would use it to harm himself. Shaw was strip-searched but no contraband was found. Shaw was given two security kilts and escorted to an observation cell. In-cell video shows that Shaw had no personal items other than the security kilts and that the cell was completely empty apart from a mat secured to the floor. Dkt. Nos. 33, 56 at ¶¶17-18, 21.

Cliver was assigned to check on the inmates on observation status every fifteen minutes and document their activity in the observation log. Cliver documented his observations of Shaw every fifteen minutes, beginning at 10:30 a.m. Shaw insists Cliver forged his entries to cover up the fact that he did not perform his rounds, but he offers no evidence to support this accusation. At 11:00 and 11:15 a.m., Cliver noted in the log that Shaw was making "cutting movements" with his hand but he did not see any blood. He notified the sergeant the first time of Shaw's movements, but not the second time because he did not believe there was a substantial risk that Shaw could

2

harm himself. At 11:30 a.m., Cliver observed blood on Shaw's arm, so he again contacted the sergeant. Dkt. Nos. 33, 56 at ¶¶38-43.

After the sergeant informed Hoffstatter that Shaw had self-harmed, Shaw was removed from his cell. Hoffstatter asserts that he noted what he believed to be a one-inch self-inflicted wound on Shaw's inner left forearm. Hoffstatter believed that Shaw had used his fingernail to cut himself because there was blood on his fingernail. A nurse treated Shaw for a half-inch laceration to his forearm. She cleaned the area and used steri-strips on the cut. Hoffstatter contacted Ms. Lowry again to inform her that Shaw had self-harmed. Shaw was to remain on observation status. For Shaw's safety, he was strip-searched again, and his cell was also searched. Again, Shaw stated he had a razor, but no contraband was found. Shaw was given two new security kilts and returned to the empty cell. Dkt. Nos. 33, 56 at ¶¶22-28.

At 12:00 p.m., Cliver noted in the log that Shaw was again making "cutting movements" and that he had notified the sergeant. He also notified the sergeant of Shaw's actions at 12:15 p.m. Cliver explains that it looked to him like Shaw was using his fingernail to reopen the same wound that had just been treated. Shaw asserts he was cutting himself with a razor, not his fingernail. Cliver continued to note in the log that Shaw was using his nail to cut himself and clarified that the supervisor was aware of Shaw's movements. Cliver also documented at 1:30 p.m. that he had notified the nurse on the unit that Shaw was cutting himself with his nail. Cliver then documented that, at about 3:45 p.m., he observed what he believed to be a razor in Shaw's hand. Around that same time, another inmate told Cliver that Shaw had a razor. It is not clear how the inmate knew this. Cliver asserts that he went to Shaw's cell to speak with him and then informed his supervisor. The inmate who informed Cliver that Shaw had a razor asserts that Cliver said he did not believe Shaw had a razor. Dkt. Nos. 33, 56 at ¶¶45-58.

3

Not long after, at about 4:00 p.m., after hearing from Cliver's supervisor that Shaw was claiming to have a razor, Hoffstatter went to Shaw's cell and asked him what he had in his hand. According to Hoffstatter, Shaw showed him a small, jagged-looking object. Hoffstatter asserts that he told Shaw to give him the object, but Shaw refused and threatened to swallow it. Hoffstatter states that he ordered Shaw to give him the object two more times, but Shaw refused and then swallowed the object. Shaw states that none of that happened, although he does not explain what happened to the object/razor. It is undisputed that Shaw was then restrained, removed from his cell, and escorted to the triage room so another nurse could evaluate him. Medical records indicate that Shaw was then examined by a nurse who looked into his mouth and throat with a flashlight. Although Shaw disputes that a nurse evaluated him, there is no dispute that Shaw had no blood or open sores, rips, or tears in his mouth. Dkt. Nos. 33, 56 at ¶¶29-35.

It is also undisputed that, after Shaw was cleared by health services, he was strip-searched for a third time. He was also searched with a handheld metal detector. Shaw asserts that he again told Hoffstatter that he had a razor, but neither search yielded any contraband. Hoffstatter contacted Ms. Lowry for a third time and informed her that Shaw had swallowed an object that he had refused to give him. Ms. Lowry then met with Shaw and after their discussion, she decided that Shaw should be placed in five-point bed restraints for his safety. The next day, an x-ray of Shaw's abdomen revealed no foreign objects in Shaw's stomach. Dkt. Nos. 33, 56 at ¶¶36-37, 71-75.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might

4

affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Shaw's claim is that Defendants violated his constitutional rights by failing to prevent him from harming himself. The Seventh Circuit has repeatedly "recognized a jail or prison official's failure to protect an inmate from self-harm as one way of establishing deliberate indifference to a serious medical need." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 349 (7th Cir. 2018). Sadly, claims of this sort have become somewhat commonplace, comprising a not insignificant percentage of the cases filed by prisoners. It is becoming apparent that some prisoners are using threats of self-harm to manipulate prison staff and engineer Eighth Amendment claims. The potential for holding correctional officers liable for a sane inmate's deliberate decision to harm himself has created a perverse incentive for some litigious and manipulative inmates to engage in the very thing that allowing these claims seeks to prevent. *See Goodvine v. VandeWalle*, No. 16-C-890, 2018 WL 460121, **7, 9 (E.D. Wis. Jan. 17, 2018) ("Goodvine admitted in the course of his testimony that

5

he has successfully sued jail and/or correctional officers on a number of previous occasions for failing to prevent him from harming himself and related claims, and has recovered at least $25,000 in settlements with the State."). Despite this obvious opportunity for abuse, the rule imposing liability on prison guards for deliberate indifference to the risk of a prisoner harming himself is well-established, and it is that law on which Shaw's claims are based.

Of course, not every claim by a prisoner that he did not receive adequate protection will succeed. *Phillips v. Diedrick*, No. 18-C-56, 2019 WL 318403 at *2 (E.D. Wis. Jan. 24, 2019) (citing *Estelle*, 429 U.S. at 104-05). To prevail on such a claim, a plaintiff will have to provide evidence showing that Defendants (1) were aware of an objectively serious risk of harm to him; and (2) knowingly or recklessly disregarded it. *Szopinski v. Koontz*, 832 F. App'x 449, 451 (7th Cir. 2020) (citations omitted).

Defendants do not dispute that a jury could reasonably conclude from Shaw's long history of self-destructive behaviors that he posed an objectively serious risk to his own health and safety. A jury could also reasonably conclude that Defendants were aware of this risk, both because Shaw's history was known to Hoffstatter and because Shaw's placement in observation status signaled to Cliver that Shaw was a risk to himself. Therefore, the question before the Court is whether a jury could reasonably conclude that each Defendant consciously disregarded that risk. For the reasons explained below, the Court concludes that it could not.

The Seventh Circuit has clarified that "[t]he test of deliberate indifference ensures that the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). "Indeed, prison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that

case it cannot be said that they were deliberately indifferent." *Id.*; *see also Pulera v. Sarzant*, 966 F.3d 540, 555-56 (7th Cir. 2020) (finding response to attempted suicide was reasonable given the chaotic circumstances because "the Constitution does not demand perfection").

The record shows that Hoffstatter decided in consultation with Ms. Lowry, the psychological services clinician, that Shaw should be placed on observation status rather than in temporary lockup because of vague statements he made while being escorted to the restrictive housing unit. Shaw asserts that his statements were not vague—he plainly threatened to harm himself. But the dispute over what Shaw actually said is not material because there is no dispute that Hoffstatter consulted with the appropriate expert, Ms. Lowry, and after doing so, agreed with her to place Shaw on observation status where he would be strip-searched, denied all personal property, and observed by correctional staff every fifteen minutes to ensure his safety. Even assuming Shaw plainly threatened self-harm as he asserts, no jury could reasonably conclude that Hoffstatter's actions in response to those threats showed that he was deliberately indifferent to the risk Shaw posed to himself.

Shaw asserts that he found a razor in the observation cell and that he told Hoffstatter and Cliver, but they ignored him. But the Seventh Circuit has repeatedly stated that prison staff are not required to believe everything inmates say, especially if the staff member verifies or investigates the complaint or threat. *See Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014); *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); *Riccardo v. Rausch*, 375 F.3d 521 (7th Cir. 2004). Defendants explain that Shaw had undergone a strip search and been placed in an empty observation cell with no personal property. The search had turned up no contraband, so even assuming Shaw did say he had a razor, it was not unreasonable for Defendants to disbelieve Shaw given his long history of attention-seeking behavior and all the efforts they undertook to ensure he

7

had nothing with which he could harm himself. As required, Cliver observed Shaw every fifteen minutes and while during that first hour he observed Shaw making "cutting movements" on his arm, he did not see any blood, confirming that Shaw did not have a razor. Still, even though he did not believe Shaw had a razor and even though he initially saw no blood on Shaw's arm, he acted prudently by reporting Shaw's actions to his supervisor, who is not a defendant in this action. When Cliver finally did observe blood on Shaw's arm, he again reported what he saw to his supervisor, who immediately informed Hoffstatter that Shaw was self-harming.

No jury could reasonably conclude that Cliver's diligent observation of Shaw and his reports to his supervisor of what he saw demonstrated deliberate indifference to the risk of harm Shaw posed to himself. The supervisor is not a defendant in this action, and even assuming that the supervisor's failure to immediately act on Cliver's information about Shaw's conduct amounted to something more than negligence, Cliver is not liable for his supervisor's initial decision to take a wait-and-see approach. *See Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) ("public employees are responsible for their own misdeeds but not for anyone else's").

Once he learned that Shaw had managed to draw blood, Hoffstatter had Shaw removed from his cell so the injury could be treated by a nurse. Shaw asserts that there was a delay between him drawing blood and him receiving treatment, but even assuming that is true, Shaw offers no evidence to support a conclusion he was harmed by the delay. *See Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (a delay in treatment may show deliberate indifference only if it exacerbates the injury or prolongs an inmate's pain). Shaw does not dispute that the small laceration that he made to his own arm was easily cleaned and treated with steri-strips. It is also undisputed that Hoffstatter again contacted Ms. Lowry and that Shaw was again strip-searched, and this time, his cell was also searched. Once again, no contraband was found. No jury could

8

reasonably conclude that Hoffstatter's response to learning that Shaw had managed to cut himself showed that he was deliberately indifferent to Shaw's injury. Nor could a jury reasonably conclude that Hoffstatter's many efforts to keep Shaw safe from himself (*e.g.*, consulting with psychological services, searching Shaw, searching Shaw's cell) showed that he was deliberately indifferent to the risk Shaw posed to himself.

Cliver resumed his fifteen-minute observations of Shaw and continued to notify his supervisor of Shaw's actions. He also notified a nurse on the unit. Cliver explains that he initially believed Shaw was using his fingernail to reopen the treated wound, but later, when he believed Shaw had somehow managed to find a razor, he immediately communicated that information to his supervisor, who relayed this new information to Hoffstatter. Hoffstatter and Shaw remember their interactions differently, but again, this dispute is immaterial. Whether Shaw swallowed or did not swallow whatever he was using to cut himself, it is undisputed that Shaw was again removed from his cell and eventually strip-searched for a third time. Hoffstatter also contacted Ms. Lowry for the third time, and she ordered that Shaw be placed in bed restraints since he appeared unwilling to control himself. Shaw was searched with a metal detector and the next day had an x-ray of his stomach, which showed that no foreign bodies were present.

Again, no jury could reasonably conclude that Cliver or Hoffstatter's response to Shaw's actions demonstrated deliberate indifference to the risk of harm he posed to himself. Cliver may have been mistaken about whether Shaw was using his fingernail or some other object when he was making his cutting motions, but a mistaken belief does not equate to deliberate indifference. *See, e.g., Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). And Cliver immediately notified his supervisor when he thought Shaw posed a *substantial* risk of harm to himself because he somehow obtained a razor. Cliver's close monitoring of Shaw and quick action

9

in response to what he believed to be an escalating risk of harm is the opposite of deliberate indifference. Similarly, the record shows that Hoffstatter tried everything within his power to prevent Shaw from hurting himself—he had him strip-searched for a third time and consulted with psychological services for a third time. At that point, it became clear that the only way to protect Shaw from himself was to place him in bed restraints. Like Cliver, Hoffstatter showed the opposite of deliberate indifference with his consistent and patient efforts to keep Shaw safe. Accordingly, Defendants are entitled to summary judgment.

Finally, 28 U.S.C. §1915(e)(2) states that "the court shall dismiss a case at any time if the court determines that the action . . . is frivolous or malicious." Defendants assert that review of the record, including hours of video evidence, demonstrates that this action was frivolous. The Court agrees. This case began with Shaw making either vague or express threats to harm himself following his refusal to obey a straightforward order to return to his cell. The officers did not ignore Shaw or disregard his threat. To the contrary, they expended significant time, attention, and resources to keep him safe, including closely consulting with psychological services, repeatedly strip-searching him and his cell, and closely observing him every fifteen minutes. Defendants and others made every effort to protect Shaw. Their efforts, even if not successful, reflect not indifference but tremendous concern for Shaw, far more concern than he had for himself. Indeed, "[i]t is difficult to imagine any institution on earth, penal or not, that could or would be expected to expend as much time, effort and resources to protect a person from himself." *Bowers v. Pollard*, 602 F. Supp. 2d 977, 993 (E.D. Wis. 2009).

Shaw may have lacked the ability to stop himself in the moment from acting out, but that does not explain his decision to pursue litigation against the people who tried so diligently to keep him safe from himself. Rather than acknowledging their efforts and patience, he forced them to

defend against frivolous claims. His actions have cost the Defendants, the State, the taxpayers, and the Court significant time and resources. A claim is legally frivolous when it lacks an arguable basis either in law or in fact. *Denton v. Hernandez*, 504 U.S. 25, 31 (1992); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). The Court may, therefore, dismiss an action as frivolous where the factual contentions are clearly baseless. *Neitzke*, 490 U.S. at 327. "Malicious," although sometimes treated as a synonym for "frivolous," "is more usefully construed as intended to harass." *Lindell v. McCallum*, 352 F.3d 1107, 1109-10 (7th Cir. 2003) (citations omitted). Development of the record confirms that not only are Defendants entitled to summary judgment, but this action must be dismissed because it is both frivolous and malicious.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Dkt. No. 31) is **GRANTED** and this action is **DISMISSED** pursuant to 28 U.S.C. §1915(e)(2) as frivolous and malicious. The clerk of court is directed to document that this inmate has incurred a "strike" under 28 U.S.C. §1915(g) and enter judgment accordingly.

Dated at Milwaukee, Wisconsin on November 12, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.